United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2751

_____

| | | |
|---|---|---|
| Great Rivers Cooperative of Southeastern Iowa, an Iowa farm cooperative; Sawyer Cooperative Equity Exchange, a Kansas farm cooperative, | * * * * * * | |
| Plaintiffs, | * * | |
| Roger Tacey, a Nebraska resident, on behalf of themselves and others similarly situated, | * * * * * | |
| Plaintiff - Appellant, | * * | Appeal from the United States District Court for the |
| v. | * * | Southern District of Iowa. |
| Farmland Industries, Inc., a Kansas farm cooperative; Harry D. Cleberg; H. Wayne Rice; Albert Shively, | * * * * * | |
| Defendants - Appellees. | * | |

_____

Submitted:  February 13, 1997

Filed:  July 29, 1997
_____

Before HANSEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
MELLOY,[1] District Judge.
_____


HANSEN, Circuit Judge.


Roger Tacey, a named plaintiff in this class action, appeals the district court's[2] grant of summary judgment to defendants as to his claims of securities fraud against Farmland Industries, Inc., as time barred.  We affirm.


I.


In reviewing the district court's grant of summary judgment, we view the facts in the light most favorable to Tacey, the nonmoving party.  Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir. 1993).  Tacey alleges the following facts.

Farmland Industries, Inc., (Farmland) is an agricultural cooperative headquartered in Kansas City, Missouri, and incorporated in Kansas.  In August of 1990, Farmland implemented a business plan known as the Base Capital Plan (BCP).

_____

[1]The Honorable Michael J. Melloy, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

[2]The Honorable Harold D. Vietor,  United States District Judge for the Southern District of Iowa.

2

As part of the BCP, Farmland planned to purchase the outstanding equity of its wholly owned subsidiary, Farmland Foods (Foods), with newly created Type 12 Capital Credits. Farmland distributed a letter discussing the BCP. Farmland also held informational meetings ("help sessions") concerning the BCP and, in particular, Farmland's offer to exchange Farmland equity for Foods equity. (Appellant's App. at 240.) In August of 1991, Farmland tendered its exchange offer.

Roger Tacey, a hog farmer from Nebraska, owned equity in Foods. Tacey received the Farmland prospectus and the letter discussing the BCP. He also attended an informational meeting. At the meeting, Tacey inquired about what would happen if he declined Farmland's offer to exchange Foods equity for Farmland equity. When the Farmland representatives would or could not inform him about the value of his Foods equity, he concluded that the only way to retain any equity value was to accept the exchange offer. Tacey traded approximately $1100 of equity certificates in Foods for approximately $900 of Farmland's Type 12 Capital Credits and $222.93 in cash. In making this trade, Tacey relied on Farmland's representations that (1) within one to two years of August 1991, the owners of the capital credits would be able to recoup their investment, either through redemption or by sale in a secondary market to be created by Farmland; (2) the value of the capital credits would be similar to the equity the offerees already held in Foods; and (3) the face value of the capital credits would be equal to the redemption value or the secondary market value.

In July of 1992, a complaint was filed against Farmland in the United States District Court for the District of Colorado. Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., No. 92-K-1394 (D. Colo.)[hereinafter Consumers]. This class action involved small, liquidated cooperatives that, pursuant to Farmland's bylaws, had exchanged common stock for capital credits and allegedly later had discovered that Farmland would not redeem the capital credits. The plaintiffs claimed Farmland had engaged in "freeze-out" schemes that adversely impacted its holders of capital credits.

3

The plaintiffs alleged RICO violations, securities fraud, breach of fiduciary duties, and unjust enrichment.

Tacey read about the Consumers case in a Farmland newsletter in October of 1992. In the article, which was entitled "Co-op sues Farmland over stock issue," Farmland described the Consumers case as "ridiculous" and "ludicrous." (Appellant's App. at 235-36.) The article stated Farmland's policy and priority schedule for redeeming its outstanding equity. The article explained that Farmland had placed capital credits quite low on its priority schedule, presently planning to redeem only five percent annually, subject to the Board of Directors' discretion based upon "earnings, capital needs and other factors." (Id. at 236.)

In late 1992, Tacey contacted a class representative in the Consumers suit and counsel for the class with regard to redemption of stock. Tacey was a member of a Nebraska cooperative that held common stock in Farmland. Tacey inquired whether the Nebraska cooperative would have to go through the Consumers' process to have its Farmland stock redeemed. Tacey did not inquire or discuss any issue regarding the Foods transaction or the possible redemption of his Type 12 Capital Credits.

The Consumers case settled in June 1993. Tacey first learned of the details of the case when he obtained a copy of the complaint and settlement papers in early 1994. In mid-1994, Tacey contacted a Farmland representative to inquire about redeeming his Type 12 Capital Credits. Tacey learned then that Farmland would redeem the capital credits for not more than three cents on the dollar and that the promised secondary market was a failure.

This class action was filed on July 29, 1994, against Farmland and three individuals who had served as officers and directors of either Farmland or Foods.[3] Tacey is one of three named plaintiffs in the action, seeking relief under various theories of securities fraud and breach of state law fiduciary duties.[4] Relevant to this appeal are the claims alleged in Count 1 (violation of Securities Exchange Act § 10(b) and Rule 10b-5), Count 4 (violation of Securities Exchange Act § 14(e)), and Count 5 (violation of Securities Exchange Act § 12(2)).

Farmland moved for summary judgment against Tacey on the basis of time bar. The district court granted this motion as to the securities fraud claims, finding as a matter of law that Tacey had inquiry notice of Farmland's alleged misrepresentations more than a year before he filed his claims. The court also dismissed the section 14(e) claim in its entirety, holding it could not go forward because the only class representative named for that claim (Tacey) no longer had a viable cause of action. Tacey appeals.

## II.

We review a grant of summary judgment de novo, using the same standards under Federal Rule of Civil Procedure 56(c) as applied by the district court. Summary judgment is appropriate when there is no genuine issue of material fact and the moving

---

[3]The three individual defendants are Harry Cleberg, H. Wayne Rice, and Albert Shively. Cleberg is the CEO, President, and a director of Farmland Industries. Rice is a former director of Farmland Foods. Shively serves as a director on and the Chair of the Farmland Industries Board of Directors.

[4]The other two named plaintiffs are two small farm cooperatives -- Great Rivers Cooperative of Southern Iowa, an Iowa corporation, and the Sawyer Cooperative Equity Exchange, a Kansas corporation.

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

A.  Inquiry Notice

The applicable statute of limitations for federal securities fraud claims is the one-year period set forth in section 13 of the 1933 Securities Act, 15 U.S.C. § 77m (1994). <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 361 (1991). Section 13 provides:

> No action shall be maintained to enforce any liability created under section 77k or 77l(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, <u>or after such discovery should have been made by the exercise of reasonable diligence</u>. . . .  In no event shall any such action be brought to enforce a liability . . . more than three years after the security was bona fide offered to the public, or . . . more than three years after the sale.

15 U.S.C. § 77m (1994) (emphasis added).  Under this provision, even if a victim does not actually know of a misrepresentation, the one-year limitation period begins to run when the victim should have discovered the misrepresentation through the exercise of reasonable diligence.  This objective standard is commonly referred to as the doctrine of "inquiry notice."  <u>See</u> <u>Davidson v. Wilson</u>, 973 F.2d 1391, 1402 (8th Cir. 1992).  We have held that inquiry notice exists when there are "storm warnings" that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission.  <u>Id.</u>  When uncontroverted evidence irrefutably demonstrates that a plaintiff had inquiry notice of fraudulent conduct, the issue of notice is amenable to summary judgment.  <u>Davis v. Birr, Wilson & Co.</u>, 839 F.2d 1369, 1370 (9th Cir. 1988).

6

At the core of the parties' first argument is a dispute over how to apply the standard of inquiry notice. Farmland argues that because inquiry notice is an objective standard, knowledge of all the facts available to the public is automatically imputed to the injured party. Thus, the argument goes, because the Consumers case was filed in Colorado, Tacey was on inquiry notice of Farmland's allegedly untrue statements as a matter of law. Tacey, on the other hand, argues that he was not on inquiry notice, despite having read about the Consumers case, because he did not have sufficient notice that Farmland would refuse to redeem the type of capital credits he owned. We disagree with both of these versions of the inquiry notice standard.

The determination of whether inquiry notice exists is an objective standard based upon the facts known to the victim. Inquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations. Davidson, 973 F.2d at 402. Breaking this standard into its components, a court must determine: (1) the facts of which the victim was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether the reasonable person would have acquired actual notice of the defendant's misrepresentations. If a reasonable person aware of the facts known to the victim would have investigated, that is, exercised reasonable diligence, and consequently discovered the misrepresentations, the victim had inquiry notice. Accord Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 (7th Cir. 1995) (describing inquiry notice as "when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim") (internal quotations omitted); Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 701 (2d Cir. 1994) (describing inquiry notice as when the plaintiff acquires "notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge"); Menowitz v. Brown, 991 F.2d 36, 41-42 (2d Cir. 1993) (same); Jensen v. Snellings, 841 F.2d 600, 606-07 (5th Cir. 1988) (same).

Farmland argues that we should engage only in the second and third prongs of the analysis we have set forth, because, according to Farmland, the question of what a victim actually knows is immaterial to our objective standard for inquiry notice. Thus, Farmland would have us <u>automatically</u> impute to Tacey constructive knowledge of any information available to the public, including all articles published on, and the public records available in, the <u>Consumers</u> case, regardless of Tacey's actual awareness. We cannot adopt this analysis. As the Seventh Circuit recently stated in rejecting this same argument, "an open door is not by itself a reason to enter a room." <u>Fujisawa Phar. Co. v. Kapoor</u>, 1997 WL 324433, *3 (7th Cir. June 16, 1997). A victim must be aware of some suspicious circumstances, some "storm warnings," to trigger the duty to investigate. <u>See</u> <u>Davidson</u>, 973 F.2d at 1402 ("The Court must determine whether the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud.") (internal quotations omitted).

We pause to note that this requirement of some awareness does not mean that an injured party will necessarily avoid the statute of limitations by turning a blind eye to what is obviously in full view. The determination of awareness is by its terms a factual analysis, and a fact finder may decide that a victim of fraud was indeed aware of public information. Further, there might be circumstances where the evidence of awareness is so overwhelming that there is no genuine dispute on the issue for purposes of summary judgment. <u>Cf.</u> <u>Whirpool Fin. Corp.</u>, 67 F.3d at 610 (imputing to Whirlpool knowledge of dramatic discrepancies between defendants' projections and actual performance); <u>Eckstein v. Balcor Film Investors</u>, 58 F.3d 1162, 1168-69 (7th Cir. 1995) (imputing knowledge to investors where the information was contained in the registration statement filed with the SEC, was widely reported, and was noted in a quarterly report that was filed with the SEC and sent to investors). We express no opinion today as to when such circumstances may exist. We simply note that we will not <u>automatically</u> impute public information to an injured party without a determination of some awareness of "storm clouds" on the horizon. More specifically, we will not

8

automatically impute to Tacey, a hog farmer in Nebraska, the details of a class action litigated in Colorado.

We therefore turn to the first prong of our analysis. In this summary judgment context, we assume the facts of Tacey's knowledge as he alleges them. He knew Farmland had been either unable or unwilling to answer his questions about the value of his Foods equity if he were to refuse to exchange it for Farmland equity. He knew he had traded approximately $1100 of equity credits in Foods for approximately $900 in Farmland's Type 12 Capital Credits and $222.93 in cash. Tacey was upset with the deal, feeling that he had been "bribed" by the cash portion of the offer, especially given the large salaries the executives of Farmland were being paid, and that Farmland was "trying to scr__ [him] out of a thousand." (Appellant's App. at 242-43.) He had called Farmland representatives "you son-of-a-b____es" at the informational meeting. (Id. at 243.) In October of 1992, through the article in the Farmland newsletter, Tacey learned that Farmland was subject to a class action suit in Colorado based on Farmland's failure to redeem other types of Farmland capital credits.

Under the second prong of our analysis, we conclude Tacey had sufficient information to trigger the duty to investigate. Given the circumstances, the article in the Farmland newsletter would make a reasonable person in Tacey's shoes suspicious that Farmland's representations regarding the redemption of Type 12 Capital Credits might be false. According to the article, the plaintiffs in the Consumers case were alleging that Farmland "deliberately ha[d] refused to redeem the capital credits of small, defunct or liquidated cooperatives" and had diverted money due to these cooperatives to large cooperatives in which Farmland's directors had a stake. (Appellant's App. at 235.) The article explains Farmland's priority schedule and reveals that, as a general matter, Farmland had prioritized the redemption of capital credits quite far behind several other types of equity interests in the schedule. The article states that the Board had scheduled the redemption of capital credits at only about five percent annually, and redemption of those credits was subject to the Board's discretion based upon "earnings,

9

capital needs and other factors." (Id. at 236.) Nowhere in the article is there any hint that any particular type of capital credits (such as the Type 12 Capital Credits owned by Tacey) were to be excepted from the general policy statements and thereby redeemable after a certain period of time. After reading this article and learning that redemption of Farmland's capital credits was not only a low priority, but also wholly discretionary on the part of Farmland's board of directors, a reasonable person who had been told (as Tacey says he was) that his capital credits would definitely be redeemable within a year or two would be suspicious that some misrepresentation had occurred. Tacey's initial and continuing dissatisfaction with the equity exchange deal, including Farmland's inability or unwillingness to predict the future value of Foods equity and Farmland's unwillingness to tender full cash payment for the Foods equity, would heighten a reasonable person's suspicion. Considering the totality of the circumstances, particularly the contents of the Farmland article, this information triggered the duty to exercise due diligence. See Fujisawa Pharm., 1997 WL 324433, at *2-3.

Tacey argues that the article in the Farmland newsletter was not a sufficient "storm warning" of Farmland's fraud. He contends the article did not put him on inquiry notice because it described the Consumers suit as "ludicrous" and "ridiculous"; Farmland's self-serving statements about the invalidity of the suit do not, however, negate the other pertinent information presented in the article. Tacey also claims that the title of the article, "Co-op sues Farmland over stock issue," led him to believe that Consumers involved the redemption of stock, not of capital credits; because he admits reading the article, Tacey had actual notice of the article's contents, which clearly explained that capital credits were at issue. We also reject Tacey's argument that his duty to investigate would not be triggered in this case because he was not a sophisticated investor and he had capital credits worth only approximately $900. Our inquiry as to whether a duty to investigate arose is an objective standard, and we conclude that a reasonable person would be suspicious of possible misrepresentations upon seeing the article in the Farmland newsletter. Finally, we reject Tacey's contention that the Consumers case did not put him on notice because that case arose

10

out of a different transaction and involved a different type of capital credits; the article Tacey read described a general policy regarding capital credits, and that information was sufficient to trigger the duty to investigate.

Lastly, we turn to the third prong of our inquiry. We conclude that upon the exercise of reasonable diligence, a reasonable person would have acquired actual notice of Farmland's alleged misrepresentations. Our hypothetical person would have acquired information regarding the Consumers suit from the representatives and attorneys of that case.[5] The claims in the Consumers case mirror those in this class action,[6] differing only in that the plaintiff class here owns a different type of capital credits than the plaintiff class in Consumers. Had Tacey exercised reasonable diligence, the facts underlying his claims under Counts 1, 4, and 5, all alleging securities fraud under federal law, would have become apparent to him.

Thus, Tacey had inquiry notice shortly after reading the article in the Farmland newsletter in October 1992, and the one-year statute of limitations began to run at that time. Because Tacey was on inquiry notice more than one year before he filed this suit in July 1994, his claims are time barred.

B. Dismissal of the 14(e) Claims as to the Entire Class

The district court dismissed Count 4, which alleged securities fraud in violation of section 14(e) of the Securities Exchange Act, in its entirety, on the basis that Tacey

_____

[5]Although Tacey contacted a Consumers representative, he failed to exercise reasonable diligence when he did not inquire about the redemption of capital credits.

[6]This striking similarity is not surprising, as the plaintiffs in Consumers were represented by the same counsel representing the class in this case.

was the only named plaintiff for that count and his claim was moot pursuant to the statute of limitations. Tacey argues that the district court erred in dismissing Count 4 as to the entire class. He contends that he remains a proper class representative both because his claim is not moot and because of the nature of class actions. Farmland argues that the class fails because Tacey's claim became moot before the class was certified.

Farmland correctly points out that whether the mootness of a class representative's claim warrants dismissal of the entire class on that count is a question of timing. Compare Sosna v. Iowa, 419 U.S. 393, 400-01 (1975) (holding that postcertification mootness of representative's claim does not render class members' claims moot) with Shipman v. Missouri Dep't of Family Serv., 877 F.2d 678, 682 (8th Cir. 1989) (affirming dismissal of class action complaint without a ruling on class certification where class representative had not filed a motion requesting class certification prior to his own claim becoming moot), cert. denied, 493 U.S. 1045 (1990). However, Tacey's claim does not technically suffer from a mootness problem; rather, he has a live controversy that is barred by the statute of limitations. Thus, we find the discussions in the mootness cases and their reliance on Article III limitations unhelpful.

Rule 23 of the Federal Rules of Civil Procedure, which sets forth the requirements for class certification, provides an answer to this puzzle. Inherent in Rule 23 is the requirement that the class representatives be members of the class. Fed. R. Civ. P. 23(a) (stating that "one or more members of a class may sue or be sued as representative parties . . . ."); Vervaecke v. Chiles, Heider & Co., 578 F.2d 713, 719-20 (8th Cir. 1978) ("The plaintiff- or defendant- representative (in a class action suit) must be a member of the class which he purportedly represents.") (quoting 3B Moore's Federal Practice ¶ 23.04, at 23-254 (2d ed. 1977)); see also Fed. R. Civ. P. 17(a) (real party in interest requirement); 7A Wright, Miller & Kane, Federal Practice and Procedure § 1761 (2d ed. 1986) (discussing requirement that representatives must be

members of the class).  Here, Tacey is not and cannot be a class member because his claim is time barred; consequently, he cannot represent the class.  See Weinberger v. Retail Credit Co., 498 F.2d 552, 556 (4th Cir. 1974); Mason v. Anheuser-Busch, Inc., 579 F. Supp. 871, 873 & n.1 (E.D. Mo 1984).  Because Tacey is the only named representative in Count 4, the putative class lacks a representative on that count. Without a class representative, the putative class cannot be certified and its claims cannot survive.  The district court's dismissal was therefore proper.  Cf. Vervaecke, 578 F.2d at 719-20 (holding district court did not abuse its discretion in striking class claims prior to class certification where class representative's claims failed).

III.

For the above reasons, we affirm the judgment of the district court.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.